ZEICHNER ELLMAN & KRAUSE LLP
Jantra Van Roy
Nathan Schwed
1211 Avenue of the Americas
New York, New York 10036
(212) 223-0400
jvanroy@zeklaw.com
nschwed@zeklaw.com

*Attorneys for ASCP, LLC and Ascribe Associates III, LLC*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------X

In Re:

LAWRENCE A. FIRST,

               Debtor.

Chapter 11

Case No. 22-11020 (MG)

Hon. Chief Judge Martin Glenn

-------------------------------------------------------------

ASCP, LLC and ASCRIBE
  ASSOCIATES III, LLC,

               Plaintiffs

        -against-

LAWRENCE A. FIRST,

               Defendant.

Adv. Pro. No.

-------------------------------------------------------------X

## <u>DISCHARGE COMPLAINT</u>

Plaintiffs ASCP, LLC ("ASCP") and Ascribe Associates III LLC ("Ascribe III GP" and, together with ASCP, the "Plaintiffs"), by their undersigned counsel, hereby object to

the discharge of Lawrence A. First, the Defendant Debtor ("First"), and in support thereof, as for their complaint allege, upon information and belief, as follows:

## PARTIES

1.     ASCP is a limited liability company organized and existing under the laws of the State of Delaware with an office at 590 Madison Avenue, 38th Floor, New York, New York 10022.  ASCP is the holder of a judgment against First in the amount of $4,726,830.29, entered March 30, 2022.

2.     Ascribe III GP is a limited liability company organized and existing under the laws of the State of Delaware with an office at 590 Madison Avenue, 38th Floor, New York, New York 10022. Ascribe III GP is the holder of "clawback" claims against First in excess of $11.2 million, which are the subject of an arbitration proceeding pending before the American Arbitration Association.

3.     Ascribe III GP was formerly known as ASOF Associates III, LLC, and changed its name to Ascribe Associates III LLC on or about July 20, 2015.

4.     First is an individual residing at 24 Kellogg Hill Road, Weston, Connecticut.  First filed a voluntary petition under Chapter 11 of the United States Bankruptcy Code on July 27, 2022 (the "Petition Date").

## JURISDICTION AND VENUE

5.     This is an action under 11 U.S.C. § 727(a) objecting to First's discharge. This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334(b) and the Southern District of New York standing order of reference dated August 28,

1986, as amended by order dated December 5, 2012. This proceeding is related to the captioned bankruptcy case.

6.     Venue of this action is proper in this District pursuant to 28 U.S.C. § 1409(a).

## BACKGROUND

**First's Assets**

7.     Prior to 2003, First was a senior partner in the Bankruptcy and Restructuring department of the law firm of Fried, Frank, Harris, Shriver & Jacobson, LLP, where he began his legal career in 1987.

8.     Prior to joining Ascribe Capital LLC ("Ascribe Capital") in 2008, First was a Managing Director and Co-Portfolio Manager in Merrill Lynch's Principal Credit Group.

9.     Ascribe Management LLC is the Advisor to Ascribe Opportunities Fund II, L.P., Ascribe Opportunities Fund II(B), L.P. and Ascribe II Alternative Investments, L.P. (together, "Ascribe II LP"). Ascribe Capital is the Advisor to Ascribe Opportunities Fund III, L.P., Ascribe Opportunities Fund III(B), L.P. and Ascribe III Alternative Investments, L.P. (together, "Ascribe III LP"). Ascribe Capital LLC was formed in connection with formation of Ascribe III funds and also serves as the Advisor to the Ascribe IV funds.

10.     In 2008, First joined Ascribe Capital. First was a Managing Director and Chief Investment officer of Ascribe Capital.

11.     Iamunno has earned no income for decades.

12.     Iamunno has had few assets other than the real estate First acquired for them to hold jointly.

13.     During the relevant period, First owned three properties: a house located at 20 Oxford Road, Scarsdale, New York (the "Scarsdale House") an apartment located at 239 Central Park West, New York, New York (the "CPW Apartment") and a townhouse located at 30 West 85th Street, New York, New York (the "Townhouse" and, collectively with the Scarsdale House and the CPW Apartment, the "Real Estate").

14.     First provided all of the funds (other than mortgage loans) used to acquire the Real Estate.

15.     First made payments on all of the mortgage loans from his funds.

16.     First provided all of the funds to maintain and improve the Real Estate.

17.     Iamunno did not provide any of the funds used to acquire, maintain and improve the Real Estate and to pay for the mortgage loans.

18.     First acquired the Scarsdale House in 1998, and the CPW Apartment in 2014.

19.     First acquired the Townhouse on May 10, 2017 (the "Townhouse Closing Date") for approximately $13 million.

20.     First funded the Townhouse acquisition with approximately $8 million of his own funds and a $5 million mortgage loan.

21. By using his own funds to pay the cash portion of the Townhouse purchase and granting Iamunno a tenancy by the entireties interest, First indirectly transferred $4 million of equity to Iamunno (the "Townhouse Purchase Transfer").

22. Iamunno did not provide reasonable equivalent value to First in exchange for the Townhouse Purchase Transfer.

23. Over a period of several years after the Townhouse Closing Date, First used approximately $10 million of his personal funds to pay for improvements at the Townhouse (the "Townhouse Improvement Transfers").

24. Iamunno did not provide reasonable equivalent value to First in exchange for the Townhouse Improvements Transfer.

25. On January 28, 2019, First sold the CPW Apartment, netting sale proceeds of $2.28 million.

26. On May 15, 2020, First sold the Scarsdale House, netting sale proceeds of approximately $665,000.

27. On or about January 22, 2022, First sold the Townhouse for $18.3 million netting sale proceeds (after payment of his mortgage) of approximately $11.3 million (the "Townhouse Sale Proceeds").

28. First received only $2,781,577.85 of the Townhouse Sale Proceeds at the closing in January 2022 and concealed the location of the funds he received until he filed for bankruptcy six months later.

29.     The remaining $8,555.704.80 of the Townhouse Sale Proceeds was delivered to Iamunno via a wire transfer to an account she maintained solely in her name (the "Townhouse Proceeds Transfer").

30.     Iamunno did not provide reasonable equivalent value to First in exchange for her receipt of the Townhouse Proceeds Transfer.

31.     First and Iamunno have concealed from Plaintiffs the location of the transferred Townhouse Sale Proceeds.

**First's Contingent Indebtedness to Ascribe II GP**

32.     Plaintiff Ascribe II GP is the sole General Partner of Ascribe Opportunities Fund II, L.P., Ascribe Opportunities Fund II(B), L.P. and Ascribe II Alternative Investments, L.P. (together, "Ascribe II LP") pursuant to the Amended and Restated Limited Partnership Agreements of American Securities Opportunities Fund II, L.P., American Securities Opportunities Fund II(B), L.P. and ASOF II Alternative Investments, L.P., (the "Ascribe II LP Partnership Agreements").[1]

33.     Section 9.4 (a) of the Ascribe II LP Partnership Agreements entitled "General Partner Clawback" (the "General Partner Clawback Provision") provides:

> (a)      If, as of any Interim Clawback Determination Date, distributions of Carried Interest to the General Partner have been made with respect to any Limited Partner which is not an Affiliated Investor in excess of the sum of (i) the amount of Carried Interest distributions which the General Partner is entitled to receive pursuant to Section 3.5(a) as of such Interim Clawback Determination Date and (ii) the amount of Carried Interest distributions which the General Partner

---

[1]   The American Securities Opportunity/ASOF funds changed their names to "Ascribe" funds on or about July 20, 2015.

would be entitled to receive pursuant to Section 3.5(a), assuming that all remaining Portfolio Investments were sold on such date for their valuations determined pursuant to Section 4.7 and the proceeds therefrom were distributed to the Partners and assuming that all Portfolio Investments of the Partnership were disposed of at the same time in a single transaction (such excess being the "Interim Clawback Amount"), then the General Partner shall be obligated to return promptly to the Partnership, by means of payments made to the Partnership by or on behalf of the General Partner, the lesser of (x) the Interim Clawback Amount with respect to such Limited Partner and (y) the After-Tax Amount of the aggregate distributions of Carried Interest to the General Partner with respect to such Limited Partner (net of any such amounts previously returned to the Partnership by the General Partner). With respect to any Interim Clawback Determination Date, the payment of such amount to the Partnership shall constitute full satisfaction by the General Partner of its obligation (each, an "Interim Clawback Obligation") under this Section 9.4(a) in respect of such Limited Partner prior to any subsequent Interim Clawback Determination Date. The Partnership shall distribute, subject to the Act, any amount so returned to such Limited Partner.

(b) If, following the dissolution and winding up of the Partnership and the distribution of all or substantially all of the Partnership's assets (the date of such event being the "Final Clawback Determination Date"), distributions of Carried Interest to the General Partner have been made with respect to any Limited Partner which is not an Affiliated Investor in excess of the amount of Carried Interest distributions which the General Partner is entitled to receive pursuant to Section 3.5(a), assuming that all Portfolio Investments of the Partnership have been disposed of at the same time in a single transaction (such excess being the "Final Clawback Amount"), then the General Partner shall be obligated to return promptly to the Partnership, by means of payments made to the Partnership by or on behalf of the General Partner, the lesser of (x) the Final Clawback Amount with respect to such Limited Partner and (y) the After-Tax Amount of the aggregate distributions of Carried Interest to the General Partner with respect to such Limited Partner (net of any such amounts previously returned to the Partnership by the General Partner). The payment of such amount to the Partnership shall constitute full satisfaction by the General Partner of its obligation (the "Final Clawback Obligation")

under this Section 9.4(b) in respect of such Limited Partner. The Partnership shall distribute, subject to the Act, any amount so returned to such Limited Partner.[2]

34.    First is a Professional Member, of Ascribe II GP, pursuant to the Amended and Restated Limited Liability Company Agreement of Ascribe Associates II, LLC, entered into as of March 29, 2013 (the "Ascribe II GP LLC Agreement").

35.    Pursuant to the Ascribe II GP LLC Agreement, each of the members of Ascribe II GP agreed to refund certain amounts previously distributed to them under certain specified circumstances.

36.    First's income generally consisted of a combination of salary, bonuses and distributions from his Ascribe activities.

37.    Section 4.6(b) of the Ascribe II GP LLC Agreement, entitled "Carried Interest Restoration and Other Obligations" (the "Clawback Provision"), provides in relevant part:

(iii)    If the Company is required to fund a Carried Interest Restoration Obligation and, after application of Section 4.6(b)(i) and Section 4.6(b)(ii), the Company has insufficient funds to satisfy such Carried Interest Restoration Obligation, then, upon at least ten (10) days' prior notice from the Managing Member, each Member shall make a capital contribution to the Company in an amount equal to the product of (i) the additional amount required to satisfy the amount of the Carried Interest Restoration Obligation at such time and (ii) such Member's Carried Interest Restoration Percentage.

\*\*\*

---

[2]    The LP agreements at issue are identical but for non-substantive conforming language.

8

(iv) … The foregoing obligations of the Members set forth in this Section 4.6(b) shall be absolute and unconditional and shall be performed without set-off, counter claim or other deduction. A Member's obligation to make capital contributions in respect of … Carried Interest Restoration Obligations under this Section 4.6(b) shall survive termination of the Company, termination of such Member's Tenure with the Advisor and its Affiliates (in the case of a Professional Member) and such Member's withdrawal from the Company, so that for purposes of this Section 4.6(b) a former Member shall continue to be treated as a Member.

38. Accordingly, each carried interest distribution gave rise simultaneously to an unliquidated, contingent claim by Ascribe II GP against each of its members, including First. Each member of Ascribe II GP was aware of the existence of such claim at the time of each carried interest distribution.

39. As of the Townhouse Closing Date, First had received $13,595,515 of cumulative carried interest distributions from Ascribe II GP for which he had an unliquidated, contingent liability in the After-Tax Amount related to these distributions (as defined in the applicable partnership documents). First was fully aware, on the Townhouse Closing Date, of his substantial contingent liabilities and the substantial risk that he would be required to restore some or all of his carried interest distributions.

**The 2018 Clawback (Ascribe II)**

40. As of December 31, 2017, the value of Ascribe II's capital account was negative $10,038,139.

41. As Ascribe Capital's Chief Investment Officer, First was intimately involved in the valuation process and knew that, as of December 31, 2017, the value of the fund assets had declined, thus triggering an obligation to restore part, but not all, of prior distributions of carried interest (the "Ascribe II GP's 1st Interim Clawback Obligation"). First also knew the

amount of his proportional share of Ascribe II GP's resulting clawback obligation ("First's 1st Interim Clawback Obligation"). On or about April 5, 2018, Ascribe II GP received the Ascribe Opportunities Fund II 2017 Year End Financial Statements which provided, in pertinent part:

> Prior to the final dissolution and winding up of the Partnerships, the General Partner may be subject to an Interim Clawback Amount, as defined in the Partnerships' Agreements, determined on the December 31 following the seventh anniversary of the Effective Date and each subsequent December 31. As of December 31, 2017, the first Interim Clawback Determination Date, assuming all of the investments held by the Partnerships at December 31, 2017 been sold at their value as of such date and the Partnerships' assets liquidated, $14.2 million in carried interest previously distributed to the General Partner has been determined to be the total Interim Clawback Obligation with respect to all Limited Partners. Accordingly, the December 31, 2017 combined statement of changes in partners' capital has been adjusted to reallocate the Interim Clawback Obligation amount. Further, the General Partner is obligated to promptly return and distribute to each applicable Limited Partner the lesser of the Interim Clawback Amount with respect to such Limited Partner and the After-Tax Amount of the aggregate distributions of carried interest to the General Partner with respect to such Limited Partner. The General Partner expects to satisfy its obligation of $14.2 million during the second quarter of 2018.

42. In the second quarter of 2018, Ascribe II GP fully funded its 1st Interim Clawback Obligation of $14,426,331.

43. First's share of Ascribe II GP's 1st Interim Clawback Obligation was $4,015,329.35 and First timely paid this amount.

**The 2019 Clawback (Ascribe II)**

44.     As of March 31, 2018 Ascribe II GP's capital account balance was <u>negative</u> $11,643,728.

45.     As of June 30, 2018 Ascribe II GP's capital account balance was <u>negative</u> $19,772,117, net of its funding of its 1st Interim Clawback Obligation.  In other words, absent Ascribe II's funding its 1st Interim Clawback Obligation, its capital account would have been <u>negative</u> $34,198,448.

46.     As of September 30, 2018 Ascribe II GP's capital account was <u>negative</u> $19,856,291.

47.     As of December 31, 2018 Ascribe II GP's capital account was <u>negative</u> $19,827,426.

48.     On or about March 28, 2019, Ascribe II GP received the Ascribe Opportunities Fund II 2018 Year End Financial Statements which provided, in pertinent part:

> Prior to the final dissolution and winding up of the Partnerships, the General Partner may be subject to Interim Clawback Amounts, as defined in the Partnerships' Agreements, determined on the December 31 following the seventh anniversary of the Effective Date and each subsequent December 31. As of December 31, 2018, the first Interim Clawback Determination Date, $14,426,331 in carried interest previously distributed to the General Partner was determined to be the Interim Clawback Obligation with respect to Limited Partners. On June 22, 2018, the General Partner returned this amount to applicable Limited Partners, which is reflected in the combined and consolidated statement of changes in partners' capital.
>
> As of December 31, 2018, assuming all of the investments held by Ascribe II had been sold at their value as of such date and the Partnership's assets liquidated, the combined and

consolidated schedule of changes in partners' capital reflects an Additional Clawback Obligation amount totaling $22,694,805. This amount is limited to the After-Tax Amount of carried interest previously distributed to the General Partner and is net of any previous returns of carried interest. This amount does not reflect any tax benefit to the General Partner in the form of an actual reduction in cash taxes payable in the year paid and which is solely attributable to the making of such payment, as this potential tax benefit cannot currently be determined. General Partner expects to satisfy its obligation to return this amount to applicable Limited Partners during the second quarter of 2019.

49. Ascribe II GP timely funded its 2nd Interim Clawback obligation.

**First's Indebtedness to ASCP**

50. In June 2019, First requested a loan from ASCP to fund his $6,019,914 Clawback Obligation to Ascribe II GP, because he was cash strapped as a result of, among other things, his funding of Townhouse renovations while he continued to live in the Scarsdale House.

51. ASCP lent First in excess of $6 million (the "ASCP Loan"), as evidenced by a promissory note dated June 10, 2019.

52. First failed to repay the ASCP Loan upon its June 1, 2021 maturity date.

53. On November 4, 2021, ASCP commenced an action against First by the filing of a summons and motion for summary judgment in lieu of complaint seeking judgment for the amount due on the ASCP Loan. (Supreme Court, State of New York, County of New York Index No. 656351/2021).

54. First appeared and opposed ASCP's motion.

55. On March 4, 2022, Justice Schecter rendered a decision granting ASCP's motion.

56. On March 30, 2022, the Court entered judgment in favor of ASCP and against First in the amount of $4,726,830.29.

57. To date, First has paid no part of the ASCP judgment.

**First's Indebtedness to Ascribe III GP**

58. Plaintiff Ascribe III GP is the sole General Partner of Ascribe Opportunities Fund III, L.P., Ascribe Opportunities Fund III(B), L.P. and Ascribe III Alternative Investments, L.P. (together, "Ascribe III LP") pursuant to the Amended and Restated Limited Partnership Agreements of American Securities Opportunities Fund III, L.P., American Securities Opportunities Fund III(B), L.P. and American Securities III Alternative Investments, L.P., (the "Ascribe III LP Partnership Agreements").[3]

59. Section 9.4(a) of the Ascribe III LP Partnership Agreements entitled "General Partner Clawback" (the "General Partner Clawback Provision") provides, in pertinent part:

> If, as of any Interim Clawback Determination Date, distributions of Carried Interest to the General Partner have been made with respect to any Limited Partner which is not an Affiliated Investor in excess of the sum of (i) the amount of Carried Interest distributions which the General Partner is entitled to receive pursuant to Section 3.5(a) as of such Interim Clawback Determination Date and (ii) the amount of Carried Interest distributions which the General Partner would be entitled to receive pursuant to Section 3.5(a), assuming that all remaining Portfolio Investments were sold on such date for their valuations determined pursuant to Section 4.7 and the proceeds therefrom were distributed to the Partners (such excess being the "Interim Clawback Amount"), then the General Partner shall be obligated to return promptly to the Partnership, by means of payments

---

[3] The American Securities Opportunity/ASOF funds changed their names to "Ascribe" funds on or about July 20, 2015.

made to the Partnership by or on behalf of the General Partner, the lesser of (x) the Interim Clawback Amount with respect to such Limited Partner and (y) the After-Tax Amount of the aggregate distributions of Carried Interest to the General Partner with respect to such Limited Partner (net of any such amounts previously returned to the Partnership by the General Partner).[4]

60.     First is a Professional Member, of Ascribe III GP, pursuant to the Amended and Restated Limited Liability Company Agreement of Ascribe Associates III, LLC, entered into as of March 29, 2013 (the "Ascribe GP LLC Agreement").

61.     Pursuant to the Ascribe III GP LLC Agreement, each of the members of Ascribe III GP agreed to refund certain amounts previously distributed to them under certain specified circumstances.

62.     Section 4.6(b) of the Ascribe III GP LLC Agreement, entitled "Carried Interest Restoration and Other Obligations" (the "Clawback Provision"), provides in relevant part:

(iii)     If the Company is required to fund a Carried Interest Restoration Obligation and, after application of Section 4.6(b)(i) and Section 4.6(b)(ii), the Company has insufficient funds to satisfy such Carried Interest Restoration Obligation, then, upon at least ten (10) days' prior notice from the Managing Member, each Member shall make a capital contribution to the Company in an amount equal to the product of (i) the additional amount required to satisfy the amount of the Carried Interest Restoration Obligation at such time and (ii) such Member's Carried Interest Restoration Percentage.

***

(iv) … The foregoing obligations of the Members set forth in this Section 4.6(b) shall be absolute and unconditional and

---

[4]     The LP agreements at issue are identical but for non-substantive conforming language.

shall be performed without set-off, counter claim or other deduction. A Member's obligation to make capital contributions in respect of … Carried Interest Restoration Obligations under this Section 4.6(b) shall survive termination of the Company, termination of such Member's Tenure with the Advisor and its Affiliates (in the case of a Professional Member) and such Member's withdrawal from the Company, so that for purposes of this Section 4.6(b) a former Member shall continue to be treated as a Member.

63.     Accordingly, each carried interest distribution gave rise simultaneously to an unliquidated, contingent claim by Ascribe III GP against each of its members, including First. Each member of Ascribe III GP LLC was aware of the existence of such claim at the time of each carried interest distribution.

64.     As of the Townhouse Closing Date, First had received $14,511,182 of cumulative carried interest distributions from Ascribe III GP for which he had an unliquidated contingent liability in the After-Tax Amount related to these distributions (as defined in the applicable partnership documents).

65.     In addition, as of the Townhouse Closing Date, First had received $1,321,584 of cumulative carried interest distributions from American Securities Associates VI, LLC for which he had an unliquidated contingent liability in the After-Tax Amount related to these distributions (as defined in the applicable partnership documents).

66.     Thus, as of the Townhouse Closing Date, First had received the aggregate sum of $29,428,281 of cumulative carried interest distributions from Ascribe II GP, Ascribe III GP, and American Securities Associates VI, LLC for which he had an unliquidated contingent liability in the After-Tax Amount related to these distributions (as defined in the applicable partnership documents).

**The 2022 Clawback (Plaintiff Ascribe III GP)**

67.     Ascribe Opportunities Fund III, LP and its parallel vehicle Ascribe Opportunities Fund III(B), LP went effective December 3, 2014 (the "Effective Date").  Their 1st Interim Clawback Determination Date was December 31, 2021.

68.     As of December 31, 2018, three years before the 1st Interim Clawback Determination Date, the capital account of Ascribe III GP, the general partner of Ascribe III LP, was <u>negative</u> $5,584,367, and it remained negative thereafter.  Specifically:

(a)     As of March 31, 2019, Ascribe III GP's capital account was <u>negative</u> $11,085,525.

(b)     As of June 30, 2019, Ascribe III GP's capital account was <u>negative</u> $33,893,387.

(c)     As of September 30, 2019, Ascribe III GPs capital account was <u>negative</u> $23,153,119.

(d)     As of December 31, 2019, Ascribe III GP's capital account was <u>negative</u> $23,693,774.

(e)     As of March 31, 2020, Ascribe III GP's capital account was <u>negative</u> $24,919,238.

(f)     As of June 30, 2020, Ascribe III GP's capital account was <u>negative</u> $25,030,728.

(g)     As of September 30, 2020, Ascribe III GP's capital account was <u>negative</u> $25,002,165.

(h)     As of December 31, 2020, Ascribe III GP's capital account was <u>negative</u> $25,068,119.

69.     On or about April 1, 2021, Ascribe III GP received the Ascribe Opportunities Fund III 2020 Year End Financial Statements which provided, in pertinent part:

> The net proceeds representing the pro-rata share of the limited partners in Ascribe Opportunities Fund III (B), L.P. (employees and affiliates of the Advisor) are not subject to the above distribution waterfall, including a preferred return and allocation of carried interest. Following the dissolution and winding up of the Partnerships and the distribution of all or substantially all of the Partnerships' assets, the General Partner will be required to return distributions in the event that (i) the preferred return (as summarized above) is not met on a cumulative basis, or (ii) the aggregate distributions of carried interest to the General Partner exceed 20% of the sum of the total cumulative net distributions to the Limited Partners and the carried interest to the General Partner. This Final Clawback Obligation, as defined in the Partnerships' Agreements, is limited to a maximum amount of 100% of the after-tax amount of carried interest distributions received by the General Partner, including any tax benefit to the General Partner in the form of an actual reduction in the cash taxes payable in respect of the tax year in which the General Partner is required to make payment of a Clawback Obligation amount. Assuming all investments held by Ascribe III at December 31, 2020 had been sold at their value at such date and the Partnerships were liquidated, $27.3 million in carried interest previously distributed to the General Partner would be subject to the Final Clawback Obligation provision of the Partnerships' Agreements. This amount reflects the after-tax carried interest distributions received by the General Partner but does not reflect any tax benefit to, or amounts paid by, the General Partner as this impact cannot currently be determined. Accordingly, the Partners' capital balances as of December 31, 2020 have been adjusted to reflect the theoretical net Final Clawback Obligation amount. Prior to the final dissolution and winding up of the Partnerships, the General Partner may be subject to an Interim Clawback Amount, as defined in the Partnerships' Agreements, determined on the December 31 following the

seventh anniversary of the Effective Date and each subsequent December 31.

70. Ascribe III GP's capital account was negative at the end of each quarter in 2021:

(a) As of March 31, 2021, Ascribe III GP's capital account was <u>negative</u> $24,866,545.

(b) As of June 30, 2021, Ascribe III GP's capital account was <u>negative</u> $25,547,284.

(c) As of September 30, 2021, Ascribe III GP's capital account was <u>negative</u> $25,676,683.

(d) As of December 31, 2021, Ascribe III GP's capital account was <u>negative</u> $25,994,767.

71. On or about April 11, 2022, Ascribe III GP received the Ascribe Opportunities Fund III 2021 Year End Financial Statements which provided, in pertinent part:

Following the dissolution and winding up of the Partnerships and the distribution of all or substantially all of the Partnerships' assets, the General Partner will be required to return distributions in the event that (i) the preferred return (as summarized above) is not met on a cumulative basis, or (ii) the aggregate distributions of carried interest to the General Partner exceed 20% of the sum of the total cumulative net distributions to the Limited Partners and the carried interest to the General Partner. This Final Clawback Obligation, as defined in the Partnerships' Agreements, is limited to a maximum amount of 100% of the after-tax amount of carried interest distributions received by the General Partner, including any tax benefit to the General Partner in the form of an actual reduction in the cash taxes payable in respect of the tax year in which the General Partner is required to make payment of a Clawback

Obligation amount. Prior to the final dissolution and winding up of the Partnerships, the General Partner may be subject to an Interim Clawback Amount, as defined in the Partnerships' Agreements, determined on the December 31 following the seventh anniversary of the Effective Date and each subsequent December 31.

As of December 31, 2021, the first Interim Clawback Determination Date, assuming all investments held by the Partnerships had been sold at their value as of such date and the Partnerships' assets liquidated, $27.3 million in after-tax carried interest previously distributed to the General Partner has been determined to be the Interim Clawback Obligation with respect to all Limited Partners and is reflected in the December 31, 2021 partners' capital balances. Further, the General Partner is obligated to promptly return and distribute to each applicable Limited Partner the Interim Clawback Amount with respect to such Limited Partner. On April 4, 2022, the General Partner returned this amount to applicable Limited Partners.

72.     As a Professional Member of Ascribe III GP, First was at all times aware that he had a continuing contingent obligation to restore part or all of his carried interest distributions, net of taxes paid.

73.     At all times, upon receiving carried interest distributions, all members of Ascribe III GP, including First, were aware of the possibility that some or all of their Clawback Obligation would be required to be funded either at the Interim Clawback Date or at the Final Clawback Date.

74.     As Ascribe Capital's Chief Investment Officer, First was intimately involved with the valuation of Ascribe III LP's assets, the corresponding value of Ascribe III GP's capital account and his share of Ascribe III GP's foreseeable 2022 clawback obligation.

75.     Thus, since 2019 First has known that the risk that he would be required to restore some or all of his carried interest distributions from Ascribe III GP was highly likely to

materialize. Ascribe III GP's members, including First, regularly received Ascribe Fund III's financials as well as individualized capital account statements showing their share of anticipated clawbacks.

76.     Pursuant to Section 4.6(b)(iii) of the Ascribe III GP LLC Agreement, by letter dated March 9, 2022, Ascribe III GP formally notified First of his absolute and unconditional obligation to make a capital contribution to Ascribe III GP in the amount of $11,204,331.00 no later than March 23, 2022 ("First's 2022 Clawback Obligation") so that Ascribe III GP could satisfy the Ascribe III GP Carried Interest Restoration Obligation ("Ascribe III GP's 2022 Clawback Obligation").

77.     Ascribe III GP timely paid its 2022 Clawback Obligation to Ascribe Fund III.

78.     First has paid no part of his 2022 Clawback Obligation to Ascribe III GP.[5]

79.     On or about June 9, 2022, Ascribe III GP commenced an arbitration proceeding before the American Arbitration Association seeking an award in its favor and against First in an amount not less than $11,204,331.00, plus all applicable and accruing interest.

80.     First was or should have been aware of his 2022 Clawback Obligation years in advance of receiving his formal ten-day notice advising him of the funding due date.

---

[5]     The shortfall resulting from First's failure to pay his 2022 Clawback Obligation was bridged by a loan to Ascribe III GP by other members of the Ascribe III GP.

**First Transfers, Removes and Conceals His Assets Shortly Before Filing for Bankruptcy**

81.     On or about January 22, 2022, First sold the Townhouse for $18.3 million netting sale proceeds (after payment of his mortgage) of approximately $11.3 million (the "Townhouse Sale Proceeds").

82.     First received only $2,781,577.85 of the Townhouse Sale Proceeds at the closing in January 2022 and concealed from Plaintiffs the location of the funds he received until he filed for bankruptcy six months later.

83.     The remaining $8,555.704.80 of the Townhouse Sale Proceeds was delivered to Iamunno via a wire transfer to an account she maintained solely in her name (the "Townhouse Proceeds Transfer").

84.     First and Iamunno have concealed from Plaintiffs the location of the transferred Townhouse Sale Proceeds.

## FIRST CLAIM FOR RELIEF

85.     Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 84.

86.     Prior to the sale of the Townhouse in January 2022, First and Iamunno held title to the Townhouse jointly as tenants by the entirety.

87.     Upon the sale of the Townhouse, First and Iamunno, each, obtained a 50% interest in the Townhouse Sale Proceeds as tenants in common.

88.     As such, First owned, at a minimum, 50% of the Townhouse Sale Proceeds.

89. Because First was insolvent at the time of the Townhouse Purchase Transfer and the Townhouse Improvement Transfers, and because Iamunno did not contribute funds to the purchase of, and improvements to, the Townhouse, First should have received 100% of the Townhouse Sale Proceeds.

90. At the time of the closing on the sale of the Townhouse (in January 2022), First was a defendant in ASCP's action to recover on the ASCP Loan, which resulted (2 months later) in ASCP's $4.7+ million judgment against First.

91. At the time of the closing on the sale of the Townhouse, First was aware of Ascribe II GP's $11.2+ million clawback claim against First.

92. In order to place a substantial portion of his assets beyond the reach of Plaintiffs and with intent to hinder, delay and defraud Plaintiffs, First arranged for the transfer to Iamunno of more than 75% of the Townhouse Sale Proceeds.

93. In order to hinder and delay Plaintiffs from enforcing their anticipated judgments, First concealed from ASCP the fact that he had moved to Connecticut and that he had deposited more than $2.5 million of the Townhouse Sale Proceeds at a Connecticut bank.

94. With intent to hinder, delay, or defraud Plaintiffs, First transferred, removed and concealed property of the estate within one year before the Petition Date.

95. Accordingly, pursuant to 11 U.S.C. § 727(a)(2), the Court should deny First a discharge.

WHEREFORE, Plaintiffs respectfully request that judgment be entered as follows:

(i)      On the first claim for relief, denying First a discharge; and

(ii)     For such other further and different relief as is just and proper.

Dated:   New York, New York
         October 24, 2022

ZEICHNER ELLMAN & KRAUSE LLP

By: /s/  Jantra Van Roy
     Jantra Van Roy
     Nathan Schwed
     1211 Avenue of the Americas
     New York, New York 10036
     (212) 223-0400
     jvanroy@zeklaw.com
     nschwed@zeklaw.com

*Attorneys for ASCP, LLC and*
*Ascribe Associates III, LLC*

4865-1033-0939, v. 3